## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TIMOTHY GREENE, et al.          )
                                       )    Case No.:  08-cv-6165
              Plaintiffs,      )
                                       )    Judge Robert M. Dow, Jr.
                                       )
         v.                       )
                                       )
CCDN, LLC, et al.             )
                                       )
             Defendants.     )

### MEMORANDUM OPINION AND ORDER

Plaintiffs Timothy and Christine Greene ("Plaintiffs") filed the instant lawsuit to assert violations of the federal Credit Repair Organizations Act, 15 U.S.C. §§ 1679 *et seq*., ("CROA"), and the Illinois Credit Service Organizations Act, 815 ILCS §§ 605/1 *et seq*., ("ICSOA"). Before the Court is Plaintiffs' motion for summary judgment [97]. For the reasons stated below, Plaintiffs' motion is granted in part and denied in part.

## I.    Background

The procedural history of this lawsuit is perplexing. Plaintiffs' second amended complaint [71] named a bevy of Defendants—19 in total. On March 14, 2011, Plaintiffs voluntarily dismissed 15 Defendants pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) [102], leaving the following four Defendants in the case: CCDN, LLC ("CCDN"), R.K. Lock & Associates ("RKLA"), Robert K. Lock, Jr., Esq. ("Lock"); and Philip M. Manger ("Manger").[1] The Court will refer to CCDN, RKLA, Lock, and Manger collectively as "Defendants."

There is no evidence on the docket sheet that any of the Defendants was properly served

---

[1] Plaintiffs' notice of voluntary dismissal also dismissed Defendant Credit Collections Reconciliation Network. Credit Collections Reconciliation Network was named as a Defendant in the amended complaint [34], but not the second amended complaint [71].

with the second amended complaint.[2]  None of the Defendants has filed an answer to the second amended complaint.  However, the docket sheet reflects that Defendants—through their counsel (now Defendant Lock)—have actively litigated this matter since Plaintiffs filed their second amended complaint on February 22, 2010 (for example, Defendants responded to Plaintiffs' motion for summary judgment).  For this reason, it is clear that Defendants are aware of the second amended complaint and have waived any defense they might have had based on defective service.[3]  See *Relational, LLC v. Hodges*, 627 F.3d 668, 672 n.4 (7th Cir. 2010) ("defenses based on a lack of personal jurisdiction, such as legally defective service may be waived").  Furthermore, the fact that Defendants have not filed their answer to the operative complaint does not preclude the Court from considering the instant summary judgment motion.  Federal Rule of Civil Procedure 56(b) provides that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment *at any time* until 30 days after the close of all discovery."  (emphasis added).  While it is unusual, a motion for summary judgment may be made and ruled upon before an answer is filed.[4]  See *In re KJK Const. Co., Inc.*, 414 B.R. 416, 426-27 (Bankr. N.D. Ill. 2009).

The Court takes the facts relevant to the disposition of the instant motion from the parties' Local Rule ("L.R.") 56.1 statements.  (See [97-1; 98-1]).  L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported

---

[2] Such proof may consist of a waiver form signed by each Defendant or Defendant's counsel or an affidavit of proof of service.  See F.R.C.P. 4(d), (l)(1).

[3] Defendants have not raised any issue concerning the lack of service of the second amended complaint.

[4] The 2010 revisions to the Federal Rules of Civil Procedure superseded the timing provisions in the former subdivisions (a) and (c) of F.R.C.P. 56.  The committee comments to the 2010 amendments provide that the revised rule now "allows a motion for summary judgment to be filed at the commencement of an action," however the comments note that "in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had."

by admissible record evidence.  See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000).  It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement.  See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004).  The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement.  See, *e.g.*, *Malec*, 191 F.R.D. at 583.  Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted.  See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584.  The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts.  See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)).  Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement— that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact.  See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir.

3

2008). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd.*, 71 F.3d at 1317 (collecting cases)).

Plaintiffs' statement of facts [97-1] contains 24 separate paragraphs. Defendants' response [98-1] does not respond "to each numbered paragraph in the moving party's statement," L.R. 56.1(b)(3)(B), but instead discusses only paragraphs 2, 3, and 13 of Plaintiffs' statement. Accordingly, to the extent that the other of the paragraphs in Plaintiffs' statement are properly supported by record evidence, they are admitted. L.R. 56.1(b)(3)(C). Defendants' statement [98-1] also contains its own 17-paragraph statement of facts. Plaintiffs have not responded to Defendants' statement of facts. Accordingly, to the extent that each of the facts in Defendants' statement of facts is properly supported by record evidence and not controverted by a fact in Plaintiffs' statement, it is admitted. L.R. 56.1(a). The Court has identified a number of instances where the facts asserted in the parties' statements of facts are not properly supported by the record evidence identified.[5] The parties' lax compliance with L.R. 56.1 made the Court's consideration of the instant motion difficult. The parties are strongly encouraged to carefully review L.R. 56.1 and Judge Castillo's opinion in *Malec v. Sanford* prior to filing or responding to another motion for summary judgment in this district.

Defendants Lock and Manger are the co-founders and owners of CCDN, which does

---

[5] In addition, Plaintiffs voluntarily dismissed the 15 Defendants identified above long after they filed their L.R. 56.1 statement. Accordingly, certain facts in their L.R. 56.1 statement pertain to individuals and entities who are no longer Defendants in this matter. Further, numerous paragraphs in Plaintiffs' L.R. 56.1 statement attempt to attribute certain statements or facts to all 19 former "Defendants" in the collective; however the portions of the record that are intended to substantiate these facts often do not have anything to do with the current four Defendants. (See, *e.g.* Pl. SOF [97-1] at ¶ 10). The Court has disregarded these facts.

4

business as the "Credit Collection Defense Network." CCDN is exclusively managed by Lock and Manger.[6] RKLA is a sole proprietorship owned entirely by Lock under which Lock practices law.

Plaintiffs and their two sons reside in Spring Valley, Illinois. Christine[7] is employed as a nurse and Timothy is employed as a police officer. In early 2006, Plaintiffs had more than $50,000 in credit card and school loan debt. Although Plaintiffs' debts were current, Plaintiffs felt that they "had a lot of debt" and Christine was concerned about the fact that they were "only making the minimum payments." (Pl. Ex. 12, Christine Dep. at 33-39). Plaintiffs sought out CCDN's help because "CCDN said that they could help me get out of debt and help me get rid of it." (*Id*. at 38:5-8).

Plaintiffs first learned of CCDN through an e-mail or Internet pop-up advertisement that they received in or around April or May of 2006. In response to that communication, Christine called a representative of CCDN (a John Charles) who directed her to Manger. Christine called Manger and asked him questions about the CCDN program. Manger told Christine that CCDN helped with credit negotiation, credit restoration, and that CCDN could help fix her credit scores. (Christine Dep. at 27-28). Manger said that CCDN "got the credit stuff that was being illegally put on our credit scores dropped, they negotiated that through their program, that there was a

---

[6] In their statement of facts [98-1 at ¶ 1], Defendants assert that Lock and RKLA "have no formal duties within Defendant CCDN * * * [h]owever, Lock and RKLA have accepted referrals of consumer clients from CCDN [and] have been engaged on occasion by CCDN to represent the interests of CCDN in various legal matters." As discussed above, the Court accepts this statement as true, and does not quibble with the fact that Lock and RKLA have no "formal duties" or titles at CCDN. That said, a review of the record and of Plaintiffs' statement of facts shows without a doubt that Lock is closely engaged in the management and operation of CCDN. (See Pl. Ex. 6, Lock Dep. at 85:8-16). Lock represents himself as CCDN's "founder" and admits that he is "a Managing Member of CCDN." Plaintiffs communicated with Lock a number of times when Lock was acting as a representative of CCDN.

[7] For ease of reference, the Court will refer to Plaintiffs by their first names when discussing them individually.

whole program that you went through." (*Id.* at 29:10-14). Manger told Christine that CCDN would "help make my credit score better by helping get rid of charges that they were stating were on my credit wrongly by helping restore anything that was wrong in my credit history." (*Id*. at 32:10-33:1-3). Following her initial conversation with Manger, Christine and Timothy spoke with Manger on a number additional occasions in order to better understand the CCDN program. (See *id*. at 44-47; Pl. Ex. 16, Timothy Dep at 18-19). During these conversations, Manger told Plaintiffs that CCDN would "negotiate and eliminate our credit card debt" and "repair and rebuild our credit back to original, if not better." (Timothy Dep at 18:16-18). Manger told Plaintiffs that CCDN would eliminate their debt without them ever having to go to court, and if a court appearance ever became necessary, then "somebody would be there to represent us." (Timothy Dep. at 24:14-21). Plaintiffs believed that by signing up for the CCDN program and by paying CCDN the approximately $6,000 that they charged, CCDN would eliminate the tens of thousands of dollars of credit card debt that they had and would restore their credit. (Timothy Dep. at 32-33).

Following these conversations, Plaintiffs obtained the required enrollment paperwork from CCDN. Plaintiffs attach the CCDN Debt Reconciliation Program Enrollment Manual (hereinafter, the "Manual") as an exhibit to their motion. Page three of the Manual (the first page following the index) is a letter signed by Lock and Manger, who identify themselves as "CCDN Founders." The letter states in part: "[w]e believe the average consumer, who finds themselves drowning in debt, deserves a second chance" and concludes by welcoming consumers to the CCDN program and to "the start of you getting a second chance!"

On page five of the Manual begins the "CCDN Program Overview," which describes the "three phases" of the "CCDN Debt Reconciliation Program." (Pl. Ex. 8 at 5-6). Phase I is the

12-month "Credit Restoration" phase.  (*Id*. at 5).  According to the Manual:

> "Credit Restoration begins as soon as you enter our program and will continue for 12 months thereafter.  Our experience is the majority of negatives will be removed from a typical customers credit reports within the first 4 to 6 months of this process, but we will continue to challenge unverified information and monitor all customers' reports for the full 12 months."

The Manual explained that customers were to send their paperwork to CCDN, who would then forward it on to another company called the "Fulfillment Center" for processing during this phase.

Phase II is the "Reconciliation" phase—"[t]he purpose of this phase is to create an administrative record and establish as much information as possible as to the ownership and validity of the alleged debt."  (*Id*. at 5-6).  During this phase, CCDN will "send out a series of proprietary letters at specific times to either the original creditor (OC) or the third party debt collector (3PDC) in an attempt to have the OC or 3PDC provide validation of the alleged debt." "If they are unable to do so, we demand they zero out our customer's account and mark it 'paid as agreed.'"  (*Id*.).  CCDN explains that "[w]hen you stop paying the creditors, they will begin their collection efforts" in the form of calls and letters.  CCDN provides a log for customers to use to record any collection attempts, which according to CCDN "typically violate several laws designed to protect the consumer."  According to the Manual, Phase II "usually takes from 3 to 8 months."

Phase III of the process is the "Federal Lawsuit" phase.  During this phase, CCDN's "paralegals conduct a compliance audit of each account for each customer."  (*Id*. at 6). Thereafter, the paralegals draft a "solid Federal Complaint" which they then forward to "one of our CCDN attorneys for filing in Federal Court."  "The assigned CCDN attorney handles this matter from here."

In the "Summary" section of the CCDN Program Overview, CCDN promises that "your

credit scores will dramatically improve and your debt resolved [sic]." (*Id.*). By following the instructions provided in the Manual, CCDN "can make this a smooth and successful process and begin getting you on the road to financial freedom." Plaintiffs attach print-outs of portions of CCDN's website as exhibits to their motion. The website repeats many of the same statements found in the Manual.[8]

The "CCDN Debt Reconciliation Program Application" begins on page 8 of the Manual. Starting on the second page of the application, the customer is asked to initial a number of statements. (Pl. Ex. 8 at 9). There, the "Client Agrees to [among other things] * * * (1) Use the CCDN or its affiliates to dispute negative items believed to be unverifiable, inaccurate or misleading and non-compliant from my credit reports; * * * (4) Forward all copies of all correspondence from the Respective Agencies; * * * and (6) Give the CCDN the authority to contact the credit bureaus, creditors and collection agencies directly."

Unbeknownst to Plaintiffs (or to anyone else who happened to read CCDN's enrollment materials or website), CCDN did not actually ever perform any work intended to improve a consumer's credit record, credit history, or credit rating. Instead, CCDN would sign customers up and forward their paperwork and payments for services related to customers' credit reports to CCDN's partners such as the Fulfillment Center, Beacon Consulting Services, and the Consumer

---

[8] Plaintiffs assert that "[i]n early 2006, Plaintiffs visited Defendants' website and relied upon statement made on the website in connection with choosing to purchase Defendants purported services." (Pl. SOF at ¶ 14). In support of this statement, Plaintiffs cite to three portions of Christine's deposition. The cited passages establish only that Christine received an e-mail regarding CCDN in early 2006—not that she visited Plaintiffs' website. The Court's review of the filed materials did not uncover any evidence that Plaintiffs ever visited CCDN's website. To the contrary, Timothy testified in his deposition that he "never did" review a CCDN website. (Timothy Dep. at 29:8-9). Regardless, as explained below, the content of the website is relevant in establishing whether CCDN qualifies as a "Credit Repair Organization" or a "Credit Service Organization" under the applicable statutes. See *Helms v. Consumerinfo.com, Inc.*, 436 F. Supp. 2d 1220, 1231 n.13 (N.D. Ala. 2005) (the CROA does not require reliance on an entity's representations in order for it to be considered to be a CRO).

Advocate Foundation, who would then purportedly perform such services for consumers.[9]  (See

Pl. Ex. 11, Manger Dep. at 118-19).  According to Defendants' unchallenged statement of facts,

CCDN was not in the credit repair or debt settlement business; instead CCDN's "primary

function is to educate consumers on their rights under state and federal consumer protection

laws, and to assist in the identification and development of those claims for referral" to attorneys

in CCDN's network, who then decide whether to pursue those claims.  (Def. SOF [98-1] at ¶ 2).

Immediately upon enrolling at CCDN, Plaintiffs paid CCDN an up-front initial fee.  (See

Pl. SOF at ¶ 13; see also Timothy Dep at 26:14-15 ("[T]hey required the money up-front.")).

Plaintiffs paid a total of $1,433.33 in July and August of 2006.[10]

Immediately upon enrolling in the CCDN program, Christine "was advised by CCDN

---

[9] According to Defendants, CCDN has referred clients to other entities such as Beacon Consulting Services and the Fulfillment Center "for educational materials and support regarding credit related issues."  (Id. at ¶ 2).  In fact, Defendants admit that CCDN "referred a number of consumers, including Plaintiffs, to the Consumer Advocate Foundation ("CAF"), for the provision of services related to the management of unsecured consumer debt."  (Id. at ¶ 7).  According to Defendants, CCDN investigated CAF and "determined that CAF was incapable of assisting consumers in the manner in which they had advertised, and that CAF was engaged in fraud."  Id.  CCDN's customers eventually lost over $75,000 to CAF's fraud.  CCDN reported CAF to the FBI and the South Carolina Attorney General.

[10] It is undisputed that CCDN required its customers to pay a fee before receiving any of its services.  In fact, the CCDN purchase agreement that Plaintiffs received on May 6, 2009 provided for a "down payment" of $2,800 for the "Credit Restoration and Debt Invalidation Platinum Package" that Plaintiffs were purchasing.  Further, both Lock and Manger admitted at their depositions that consumers are required to pay CCDN fees in advance of them performing any services.  Defendants seek to create an issue of fact regarding to whom Plaintiffs paid the fee.  (See Def. SOF at 14).  Plaintiffs made three payments upon enrolling in the CCDN program and they attach the actual money orders for each payment as an exhibit to their motion.  The first two money orders are dated July 28, 2006 and are made out to "CCDN/John Charles."  It is undisputed that Charles was then acting as a marketer/agent for CCDN.  The last payment is dated August 31, 2006 and made out to "Debt to Credit/John Charles."  (See Pl. Ex. 20).  Exhibit 21 to Plaintiffs' motion explains why Plaintiffs did not make out their last payment to CCDN.  In an e-mail to Plaintiffs, Charles directs Plaintiffs to make their check payable to "Debt to Credit"— Charles' company.  (Pl. Ex. 21).  However, the purchase agreement attached to that e-mail specifies that the "Agreement is entered into by" Plaintiffs, Debt to Credit Educational Services, Charles, and CCDN.  That Plaintiffs' final money order did not have CCDN's name written on it is of no import—it is undisputed that the entire $1,433.33 down payment was intended for and directed to CCDN.  (See Pl. Ex. 19, Lock Dep. at 33:6-10) ("Q: Just for the record, when one of these clients pays a marketer, that money was supposed to go to CCDN, correct?  A: Yes.").

support to stop making payments to my creditors and my student loan."[11] (Christine Dep. at 77:24 – 78:1; 78-79). Predictably, Plaintiffs soon began receiving threatening calls and letters from creditors and debt collectors both at home and work. Plaintiffs were eventually sued for their outstanding debts and received no assistance or representation whatsoever from Defendants. Defendants admit that they effectively performed no work on Plaintiffs' behalf and gave Plaintiffs no valuable guidance or advice other than tersely responding to some of Plaintiffs' e-mails wherein Plaintiffs expressed concerns about their lack of progress in having their problems resolved and the frightening letters and calls that they kept receiving. (See, *e.g.* Pl. Exs. 22; 25; 26; 27).

For example, On July 6, 2007, Plaintiffs e-mailed Lock directly. (See Pl. Ex. 15). Plaintiffs asked why CCDN had not appeared in court to represent them in their collection matters after representing that they would. Plaintiffs also asked what steps CCDN had taken to improve their credit. See *id.* ("Mr. Lock can you please give us an explanation on how this program is working for us, because other than filing paperwork sent to us by CCDN, we don't see the intervention from CCDN where it was explained they would fight for us (credit restoration and debt negotiation)."). On July 12, 2007, Lock sent a response e-mail that did not directly answer Plaintiffs' questions but instead told Plaintiffs that "[t]he fact that the collectors are calling is good" and to be sure to "[r]ecord the harassing and abusive tactics that they use, as they are civil and criminal violations."[12] *Id.*

There is no dispute that Plaintiffs never signed any sort of separate agreement with Lock,

---

[11] Christine received this directive from employees at CCDN customer support. Defendant Lock, RKLA, and Manger never directly told Christine to stop paying her valid debts. (Def. SOF [98-1] at ¶ 17).

[12] Christine also spoke with Manger on the phone several times throughout the program when she felt things were not progressing well. (Christine Dep. 76:12-13).

RKLA, or Manger directly, or obtained their services directly for any matter. Plaintiffs never paid any money directly to Lock, RKL, or Manger.

## II.     Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

Congress passed the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679 *et seq.,* in 1996 in response to the growing trend whereby "credit repair" companies used abusive and misleading practices to take advantage of debtors seeking to improve their credit records. See 15 U.S.C. § 1679(a); *Fed'l Trade Comm'n v. Gill,* 265 F.3d 944, 947 (9th Cir. 2001).  The statute was meant "to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services" and "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)**.**  In support of those purposes, Congress developed a scheme to subject credit repair organizations ("CROs") to certain requirements in dealing with consumers and to prohibit them from engaging in deceptive practices injurious to the public.  See *id.* §§ 1679b-1679e; see also *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 258 (D. Mass. 2008).  As described below, the CROA also prohibits any "person" from making false, misleading, or fraudulent statements about the services offered by a CRO or in connection with the sale of those services.  *Id.* at §§ 1679b(a)(3)-(4).

Plaintiffs also allege violations of a similar Illinois law—the Illinois Credit Service Organizations Act, 815 ILCS §§ 605/1 *et seq.*, ("ICSOA").  Like the CROA, the ICSOA was intended to "provide prospective consumers of credit services companies with the information necessary to make an informed decision regarding the purchase of [credit repair] services and to protect the public from unfair or deceptive advertising and business practices."  815 ILCS 605/2; see also *Midstate Siding and Window Co., Inc. v. Rogers*, 789 N.E.2d 1248, 1254 (Ill. 2003) ("The Credit Services Act is aimed at remedying problems encountered by consumers seeking to

improve their credit history or rating, obtain more favorable terms on current debt, or obtain an

extension of credit through services provided by credit services organizations.").  The ICSOA is

to be "liberally construed to effect the purposes thereof."  815 ILCS 605/16.  The CROA does

not preempt similar state laws, such as the ICSOA, except to the extent that the applicable state

law and the CROA are inconsistent.  15 U.S.C. § 1679j.

Plaintiffs seek to resolve their lawsuit against Defendants in one fell swoop, moving for

summary judgment on the following four issues:

(1)     Whether each of the Defendants is a "credit repair organization" under the
CROA, 15 U.S.C. § 1679a(3), and whether each of the Defendants is a "credit
service organization" under the ICSOA, 815 ILCS 605/3(d).

(2)     Whether each of the Defendants violated § 1679b(b) of the CROA and §
605/5(1) of the ICSOA by demanding and receiving payments from Plaintiffs in
advance of fully performing the service offered.

(3)     Whether each of the Defendants violated §§ 1679b(a)(3) & (4) of the
CROA and § 605/5(4) of the ICSOA by making false and deceptive statements
about the purported services being offered.

(4)     Whether the Court should award Plaintiffs a refund of $1,433.33 and
punitive damages of $100,000.

The Court will address each of these issues in turn.

### A.     Whether Each Defendant Qualifies As a "Credit Repair Organization" or a "Credit Service Organization"

The first set of issues presented in Plaintiffs' motion for summary judgment are

definitional: whether each of the Defendants is a "credit repair organization" ("CRO") under the

CROA, 15 U.S.C. § 1679a(3), and whether each of the Defendants is a "credit service

organization" under the ICSOA, 815 ILCS 605/3(d).  The Court begins with the CROA.

Under the CROA, a "credit repair organization" * * *

(A) means any person who uses any instrumentality of interstate commerce or the
mails to sell, provide, or perform (or represent that such person can or will sell,

provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of —

>   (i) improving any consumer's credit record, credit history, or credit rating; or

>   (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i);

§ 1679a(3). Section 1679a(3)(B) contains three exceptions to this definition that are not relevant here.

"Case law interpreting the definition of a credit repair organization under the CROA is scarce." *Plattner v. Edge Solutions, Inc.*, 422 F. Supp. 2d. 969, 972 (N.D. Ill. 2006); see also *White v. Financial Credit Corp.*, 2001 WL 1665386, at *6 (N.D. Ill. Dec. 27, 2001) ("Few reported cases interpret the CROA"). That said, Judge Gottschall's decision in *Plattner* provides helpful guidance regarding how courts have construed the definition of a "credit repair organization" found in 15 U.S.C. § 1679a(3)(A). In *Plattner*, Judge Gottschall held that the defendant was not a CRO because the defendant never represented that it would improve customers' credit. See *id*. at 974-75. Instead, the defendant at issue had only provided advice to customers about strategies or decisions for dealing with their debts. See *id*. (the statute was intended "to reach such entities whose focus is the improvement or repair of a consumer's credit record, credit history or credit rating, expressly or implicitly, not entities whose activities are aimed at assisting consumers in developing "creditworthy behavior" and paying their debts, which may result in improved actual credit as a collateral consequence, rather than as a program objective."). Further, after examining all of the defendant's materials, the court concluded that "[e]ven an unsophisticated debtor reviewing the program documents could not be left with the impression that [the defendant] was offering to improve his credit." *Id*. at 976. While the defendant in *Plattner* did not meet the definition, the court found that the "statutory definition of

14

a credit repair organization is extremely broad" and reaches any person who uses an instrumentality of interstate commerce to perform services with, among other things, an "implied purpose" of improving a consumer's credit record. *Id*. at 972.

With the statutory definition found in § 1679a(3)(A) and guidance from relevant case law in mind, the Court concludes that CCDN is a "credit repair organization" under the CROA.[13] Manger explicitly told Plaintiffs that CCDN helped with credit negotiation, credit restoration, and that CCDN could help fix their credit scores. The enrollment materials confirmed to Plaintiffs that CCDN would help to repair and restore their credit. For example, Phase I of the CCDN program is called "Credit Restoration" and CCDN represented that "[o]ur experience is the majority of negatives will be removed from a typical customers credit reports within the first 4 to 6 months of this process." The "Summary" section of CCDN's Manual promised that "your credit scores will dramatically improve and your debt resolved [sic]." These are only a few illustrative examples. The Court has examined CCDN's website, its enrollment materials, and the testimony of all the relevant witnesses and concludes that any consumer communicating with CCDN certainly would "be left with the impression that [CCDN] was offering to improve his credit." *Plattner*, 422 F. Supp. at 976; see also *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 274 (D. Mass. 2008) (concluding that defendants were CROs when their "advertisements [* * *] and informational materials undisputedly and repeatedly made statements to consumers indicating that their debt management services would 'restore your credit rating' and 'improve your credit.'"). While one of CCDN's espoused purposes was to develop and refer claims to its network of attorneys, it also explicitly represented that consumers

---

[13] There is no dispute that CCDN used an instrumentality of interstate commerce to promote its business.

who entered its program would see their credit scores "dramatically improve" and see their debts "resolved."

As discussed above, Defendants' response is based on the fact that CCDN did not actually perform any work intended to improve a consumer's credit record. Instead, CCDN's partners (such as CAF) would provide these services for consumers. This argument fails, however, because it is irrelevant whether CCDN actually endeavored to improve consumers' credit scores. A person need not actually attempt to improve a consumer's credit record, history, or rating in order to meet the statutory definition. Instead, an organization need only "represent" that it can or will provide these services. 15 U.S.C. § 1679a(3)(A); see also *Plattner*, 422 F. Supp. 2d at 974 (citing *Polacsek v. Debticated Consumer Counseling, Inc.,* 413 F. Supp. 2d 539, 546 (D. Md. 2005) ("Whether a company is a credit repair organization under the CROA depends on the representations made.")). The dispositive fact is that CCDN represented that it would provide credit repair services for consumers. In fact, at numerous points during his depositions, Defendant Lock admitted that a consumer viewing CCDN's website could be left with the misleading impression that CCDN (and not its partners) would perform credit repair and restoration services for its clients.[14]

---

[14] See, *e.g.* Pl. Ex 6, Lock Dep. at 107-108:

> Q: Would I be correct in stating that CCDN represents that it can perform credit restoration services?
> A: You would be correct in saying that—you would be correct in saying that there may be some misleading language on CCDN's website as to how credit restoration issues are dealt with. That's something that as a result of this lawsuit I looked at for the first time and – but CCDN as an entity does not and has not ever engaged in the provision of credit repair services for any client.
> Q: Okay. I think your answer was slightly different from my question. My question was would I be correct in stating that CCDN represents that it can perform credit restoration services? [* * *]
> A: I believe that there is language, though, on the website and in some of the materials that a consumer might draw those conclusions.

See also Pl. Ex. 19, Lock Dep. at 52-56; Manger Dep. at 97-103; 126-27; 129-130.

Defendants Lock and Manger are CROs for the same reasons as is CCDN. As discussed in detail above, Manger made numerous promises to Plaintiffs that CCDN would improve their credit. Both the website and CCDN's enrollment materials identified Lock and Manger as "founders" of CCDN. In fact, Manger admitted at his deposition that a consumer could interpret the key representations from these materials as coming from Lock and Manger personally, as well as from CCDN. (See Manger Dep. at 128:8-16). Further, the CROA provides that an individual who "provid[es] advice or assistance to any consumer with regard" to the consumer's obtaining services from a CRO is himself a CRO. § 1679a(3)(A)(ii). As shown above, Lock and Manger each personally communicated with Plaintiffs a number of times on CCDN's behalf and personally encouraged and assisted them in obtaining and continuing to receive CCDN's services.[15]

While the Court has concluded that there is no genuine issue as to any material fact regarding whether CCDN, Lock, and Manger are "credit repair organizations" under the statute,

---

[15] In any event, as will become evidence below, whether Lock and Manger (as opposed to CCDN) technically qualify as CROs is not relevant to the ultimate disposition of the instant motion. Plaintiffs' motion suggests that in order to be governed by § 1679b of the CROA, a defendant must be a "credit repair organization" as defined by the statute. This is not entirely correct. Section 1679b(b) provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." Accordingly, only CROs are governed by § 1679b(b). However, § 1679(a)(3) & (4) provides that "[n]o *person* may * * *" take the actions prohibited by that section of the statute. "'Case law in this district teaches that, even where a plaintiff cannot prove that the defendant is a credit repair organization within the meaning of section 1679a(3)(A) of the CROA, the plaintiff potentially can nevertheless state a claim * * * under section 1679b of the CROA.'" *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 899 (N.D. Ill. 2009) (quoting *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 727 (N.D. Ill. 2005)); *Ware v. Indymac Bank, FSB*, 534 F. Supp. 2d 835, 845 (N.D. Ill. 2008) (same); *Bigalke v. Creditrust Corp.*, 162 F.Supp.2d 996, 999 (N.D. Ill. 2001) ("section 1679b(a) applies to "person[s]" which is a broader definition than that of a credit repair organization"); see also *Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 542-43 (W.D. Pa. 2009) (holding same and noting that "[w]hen Congress uses different terms in the same statute and in the absence of contrary evidence, the terms have different meanings"). The ICSOA is worded differently; its operative provisions only apply to "credit service organization[s], its salespersons, agents or representatives, or any independent contractor who sells or attempts to sell the services of a credit services organization." 815 ILCS 605/5.

the same cannot be said for RKLA. The Court was unable to locate any communication from RKLA to consumers whereby RKLA represented that it could improve customers' credit. Accordingly, Plaintiffs' motion is denied as to RKLA.

The Court now moves on to the ICSOA. The ICSOA's definition of a "credit service organization" is very similar to the corresponding definition in the CROA:

> "Credit Services Organization" means a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides, or represents that the person can or will provide, any of the following services:
>
> (i) improving a buyer's credit record, history, or rating;
>
> (ii) obtaining an extension of credit for a buyer; or
>
> (iii) providing advice or assistance to a buyer with regard to either subsection (i) or (ii).

815 ILCS 605/3(d) also contains three exceptions to the above definition, which are not relevant here.

For the reasons discussed above, CCDN, Lock, and Manger each represented that CCDN could improve Plaintiffs' credit record, history, or rating, or assisted Plaintiffs' in obtaining CCDN's services. Accordingly, CCDN, Lock, and Manger are "credit services organizations" under § 605/3(d) of the ICSOA. Here again, whether Lock and Manger technically meet the definition of a "credit service organization" is of little import, as the ICSOA applies to credit service organizations plus all "salespersons, agents or representatives, or any independent contractor who sells or attempts to sell the services of a credit services organization." As founders intimately involved in its operations, Lock and Manger surely qualify as "agents or representatives" of CCDN. As explained above, Plaintiffs have not sufficiently demonstrated that Defendant RKLA meets the ICSOA's definition of a "credit service organization," and Plaintiffs' motion is therefore denied in that respect.

### B.      Receiving Payment in Advance of Services Performed

The next issue presented by Plaintiffs' motion is whether each of the Defendants violated § 1679b(b) of the CROA and § 605/5(1) of the ICSOA by demanding and receiving payments from Plaintiffs in advance of fully performing the service offered.  Section 1679b(b) of the CROA provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."  Similarly, § 605/5(1) of the ICSOA provides that no credit services organization (or agent thereof) may "[c]harge or receive any money or other valuable consideration prior to full and complete performance of the services the credit services organization has agreed to perform for or on behalf of the buyer."[16]

The Court concludes that CCDN violated the applicable provisions of the CROA and ICSOA by charging and receiving payments from Plaintiffs before performing any services for them.  15 U.S.C. § 1679b(b); 815 ILCS § 605/5(1); see also *F.T.C. v. Gill*, 265 F.3d 944, 956 (9th Cir. 2001) (conduct of credit repair organization CRO, in requiring clients to provide down payment for services at conclusion of initial consultation, violated provision of CROA precluding CROs from accepting any payment prior to fully completing all services).  Again, because RKLA is not a "credit repair organization" or "credit services organization," it is not governed by these provisions and therefore not be liable for violating them.[17]

---

[16] Section 605/5(1) exempts credit services organizations from this requirement if they obtain a surety bond.  There is no suggestion that such a bond was obtained in this case.

[17] With regard to the ICSOA, Plaintiffs present no evidence that RKLA is a "salesperson[], agent[] or representative[], or [* * *] independent contractor" of CCDN such that it could be liable under Section 605/5(1).

A more difficult question is whether Lock and/or Manger violated these provisions of the CROA and the ICSOA. Plaintiffs did not contract with Lock and Manger *personally*, and directed their money orders to CCDN, not to Lock and Manger in their individual capacities. For these reasons, the Court concludes that summary judgment against Lock and Manger should not be granted with respect to the allegation that each violated § 1679b(b) of the CROA and § 605/5(1) of the ICSOA.

In reaching this conclusion, the Court has found the decision in *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 271 (D. Mass. 2008) to be instructive. The individual defendants in that case "moved for summary judgment on the ground that the [plaintiffs] cannot bring suit against them because they only dealt with [the entity-defendant] and thus any CROA violations were committed only by [that defendant]." *Id*. The defendants raised the argument despite the fact that the individual defendants were "intertwined in the * * * credit repair business" operated by the entity-defendant. *Id*. at 259. The *Zimmerman* court rejected this argument for two reasons. First, the court noted that the plaintiffs had sued under § 1679b(a)(4), which, as explained above, applies to "any person" and not just credit repair organizations. That consideration does not help Plaintiffs here, as § 1679b(b) only applies to credit repair organizations. The second argument accepted by the *Zimmerman* court was that the individual defendants were liable on a "veil piercing" theory. *Id.* at 272. The *Zimmerman* court analyzed the elements of Massachusetts' veil piercing doctrine and concluded that the corporate entity was merely an alter ego for the individual defendants' personal interests; accordingly the court found the individual defendants to be personally liable. *Id.* Plaintiffs have not advanced a similar argument under Illinois' veil piercing doctrine as to why Lock and Manger should be held liable

for CCDN's improper acceptance of the down payment. For these reasons, summary judgment on this aspect of Plaintiffs' claims is granted as to CCDN only.

### C. False and Deceptive Statements

The next question presented by Plaintiffs' motion is whether each of the Defendants made false or misleading statements in violation of the CROA and the ICSOA. The Court answers in the affirmative and concludes that Defendants Lock, Manger, and CCDN are each liable for violating the following statutory provisions:

> Section §§ 1679b(a)(3) & (4) of the CSOA provide that "[n]o person may * * *
>
> (3) make or use any untrue or misleading representation of the services of the credit repair organization; or
>
> (4) engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

Similarly, 815 ILCS § 605/5(4) provides that "[n]o credit services organization, its salespersons, agents or representatives, or any independent contractor who sells or attempts to sell the services of a credit services organization shall:

> (4) Make or use any untrue or misleading representations in the offer or sale of the services of a credit services organization or engage, directly or indirectly, in any act, practice or course of business intended to defraud or deceive a buyer in connection with the office or sale of such services; including but not limited to: the amount or type of credit a consumer can expect to receive as a result of the performance of the services offered; the qualifications, training or experience of its personnel; or the amount of credit improvement the consumer can expect to receive as a result of the services."

First, Defendants CCDN, Lock, and Manger made a number of "untrue or misleading representation[s]" about the services that CCDN provides. § 1679b(a)(3). For example, in discussing Phase I ("Credit Restoration") of CCDN's Debt Reconciliation Program, CCDN, Lock, and Manger represented that "we [CCDN] will continue to challenge unverified

information and monitor all customers' reports for the full 12 months." In fact, Defendants have admitted that CCDN would not challenge unverified information and provided no monitoring services. Defendant Lock admitted that this and similar statements in CCDN's Manual and on its website could be "misleading" to consumers viewing those materials. See *supra* n. 14. CCDN, Lock, and Manger also represented in the CCDN Manual that during "Phase II," CCDN would "send out a series of proprietary letters" to debtors and debt collectors in an attempt to have them "provide validation of the alleged debt." In fact, Defendants merely provided Plaintiffs with form letters for *them* to send to debtors—nothing was sent from CCDN directly. (Manger Dep. at 103-104). The Manual also represented that CCDN "demand [debtors] zero out our customer's account and mark it 'paid as agreed.'" CCDN never provided that service.

Crucially, CCDN, Lock, and Manger repeatedly told Plaintiffs that they would take active steps to repair and improve their credit scores. This was undoubtedly false. CCDN, Lock, and Manger promised Plaintiffs that if they participated in the CCDN program, then the "majority of negatives will be removed from a typical customers credit reports" and that their "credit scores will dramatically improve." In point of fact, neither Defendants (nor any of their affiliates) took any steps whatsoever toward accomplishing these goals. As discussed above, Defendants admit that they "effectively performed no work on Plaintiffs' behalf and gave Plaintiffs no valuable guidance or advice." (Pl. SOF at ¶ 21).[18] Instead of seeing an improvement, Plaintiffs saw their credit worsen. Defendants' conduct certainly constituted a fraudulent or deceptive course of business that violated § 1679b(a)(4) of the CROA and § 605/5(4) of the ICSOA.

---

[18] Moreover, since "no credit repair company can legitimately remove or enable consumers to remove all negative entries from a consumer's credit report," one court found that an unqualified representation that "consumers could boost their credit scores into the 700s and 'Remove ANY and ALL Negative Accounts From Your Credit Report' with the defendants' assistance" was necessarily fraudulent. *F.T.C. v. RCA Credit Services, LLC*, 727 F. Supp. 2d 1320, 1329-30 (M.D. Fla. 2010).

Finally, Manger told Plaintiffs that CCDN would send an attorney to represent them if they ever ended up in court. When Plaintiffs were sued for their outstanding debts, CCDN did not provide the promised representation. (*Id*. at ¶ 20).

The above discussion focused on false or misleading statements made by Defendants CCDN, Lock, and Manger—not RKLA. This is because Plaintiffs have not identified any false or misleading statements made by RKLA (or by Lock acting in his capacity as an attorney with RKLA). Similarly, Plaintiffs have not introduced facts sufficient to implicate RKLA in CCDN's fraudulent or deceptive business practices. Accordingly, as to RKLA alone, summary judgment on this element of Plaintiffs' claim is not warranted.[19]

### D.      Damages

Having found that Defendants Lock, Manger, and CCDN violated the CROA and the ICSOA, the next issue presented by Plaintiffs' motion is whether the Court should award actual and punitive damages.

The CROA, at § 1679g, provides that upon a finding of Defendants' liability, Plaintiffs are entitled to receive damages in the amount of "any actual damage sustained by such person * * * [or] any amount paid by the person to the credit repair organization." § 1679g(a)(1).[20] Plaintiffs ask for reimbursement of the $1,433.33 down payment that they paid to Defendants.

---

[19] In their response, Defendants take issue with the fact that during their depositions, Plaintiffs appeared ill-informed regarding the details of their complaint or the precise legal nature of the claims that they were asserting against Defendants. The Supreme Court has held that a plaintiff need not be particularly well informed about the particulars of her lawsuit in order to maintain a claim. In *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966), it was not enough to defeat class certification that a named plaintiff did not understand her complaint at all, could not explain the statements in it, had little knowledge of what the lawsuit was about, did not know the defendants by name, nor even the nature of the misconduct of the defendants. See also *Eggleston v. Chicago Journeymen Plumbers' Local Union 130, et al.*, 657 F.2d 890, 898 (7th Cir. 1981).

[20] The ICSOA, at Section 605/11 similarly provides for an award of actual damages.

The Court agrees that Plaintiffs are entitled to this amount. Defendants Lock, Manger, and CCDN are liable to Plaintiffs in the amount of $1,433.33.

Plaintiffs also ask for punitive damages in the amount of $100,000. The CROA, at § 1679g(a)(2) provides for punitive damages as allowed by the court. The statute specifies three factors to be considered by the Court in determining the amount of punitive damages in individual actions such as this:

> (1) the frequency and persistence of noncompliance by the credit repair organization;
>
> (2) the nature of the noncompliance; [and]
>
> (3) the extent to which such noncompliance was intentional.[21]

*Id*.

In view of Defendants' conduct, some award of punitive damages may well be appropriate. However, it would be inappropriate for this Court to definitely determine that punitive damages should be awarded (and in what amount) at this stage of the litigation. The third factor asks the Court to determine "the extent to which such noncompliance was intentional." The Seventh Circuit has recognized that "[a]s a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.,* 503 F.3d 588, 594 (7th Cir. 2007). Accordingly, it would be inappropriate for the Court to make conclusions about Defendants' intent to violate the statutes at the summary judgment stage. See *Mark I, Inc. v. R.G. Intern. Corp.*, 1991 WL 181061, at *4 (N.D. Ill. Sept. 9, 1991) (reserving issues of damages for trial and noting "[t]he court is not inclined to award punitive damages on summary judgment. The determination of issues of unreasonableness and bad faith very often turn on the demeanor and credibility of witnesses.").

---

[21] The ICSOA, at Section 605/11 similarly provides for an award of punitive damages.

**IV.    Conclusion**

For the foregoing reasons, Plaintiffs' motion for summary judgment [97] is granted in part and denied in part, in the manner described above.  Defendants Lock, Manger, and CCDN are liable to Plaintiffs in the amount of $1,433.33.  The issue of the appropriateness and amount of any punitive damages is reserved for trial.

Dated:  March 25, 2011                        _____

                                             Robert M. Dow, Jr.
                                             United States District Judge